This appeal arises from a juvenile court decision granting permanent custody of the minor children Richard Taylor (Ricky) and Jason Taylor to Appellee Belmont County Department of Human Services Children Services Agency (hereinafter CSA) and terminating the parental rights of the parents, Appellant Tammy Taylor and Tim Taylor. For the following reasons, this Court affirms the lower court decision.
The Taylors divorced in June of 1996. Ricky and Jason were born of the marriage. (Tr. pp. 92, 154). Appellant has an IQ of 73 which indicates borderline intelligence and her current husband admits that he is a "slow learner." (Tr. pp. 10, 99). Biological father Tim Taylor admitted that he could not care for the children because of his own low level of intellectual functioning. (7/23/96 voluntary Surrender Agreement resigned and approved 9/19/96). Appellant also suffers from epileptic seizures and is on medication for the condition.
The children also have certain disabilities. Ricky was diagnosed with a severe seizure disorder that requires great attention and medical care. (Tr. p. 39). Ricky also has severe delays in his motor skills and uses a walker. Jason has developmental delays and speech difficulties. (Tr. p. 47, 110) The developmental delays have been attributed, in part, to a lack of stimulation. (Tr. p. 111).
On August 21, 1995, CSA filed a written complaint requesting emergency temporary custody. The complaint alleged that the children were dependent because their condition or environment warranted that the State assume guardianship in the best interests of the children. The complaint as regards Ricky stated that he had been given an overdose of anti-seizure medication which caused a high toxin level in his blood. As to both Ricky and Jason, it was alleged that due to domestic violence between Appellant and Taylor, Appellant would take the children out late at night, that both parents were drinking alcohol in front of the children and that Appellant was on numerous medications and had been ordered not to drink alcohol. (8/21/95 Complaints). The trial court granted CSA emergency temporary custody.
On October 13, 1995, after the parents stipulated to a finding of dependency of the children, the court granted CSA temporary custody and granted the parents supervised visitations. CSA established a case plan with objectives. On November 13, 1995, a second case plan was established with essentially the same objectives as the first. Both parents signed the case plan on that date. The goal was to reunify the children with their parents by November of 1996. The following objectives were set forth in the case plan:
 1. Appellant and Taylor were to obtain an adequate home free of abuse and neglect for their children.
 2. Appellant and Taylor were to attend Community Mental Health to have psychological evaluation and counseling as recommended.
 3. Appellant and Taylor were to attend drug and alcohol assessment and counseling as recommended.
 4. Appellant and Taylor were to attend and complete agency parenting classes.
 5. Appellant and Taylor were to work cooperatively with Florence Crittendon Outreach Services.
 8. Appellant and Taylor were to attend all of Ricky's Easter Seal appointments to learn adequate therapy techniques for his special needs.
 7. Appellant and Taylor were to attend marriage counseling to deal with domestic violence issues.
On April 15, 1996, CSA filed motions requesting that the court modify its temporary custody order to permanent custody in CSA based upon the parent's minimal progress on the case plans and the lack of demonstration that the parents could care for themselves, much less their young children, one of whom had very special needs. (4/15/96, Motions for Modification of Temporary Commitment to Permanent Commitment for Richard Taylor and Jason Taylor).
On September 19, 1996, the court held a permanent custody hearing and testimony was presented. On July 23, 1996, Taylor had signed a Voluntary Permanent Surrender Agreement pursuant to R.C.5103.15 voluntarily relinquishing his parental rights to the children. Before trial, Taylor, through his guardian, reaffirmed his intention to relinquish his parental rights and he initialed his previously signed surrender agreement. The juvenile court approved the agreement at trial and in its resulting journal entry.
After trial, which included testimony from Appellant, the juvenile court granted permanent custody of Ricky and Jason to CSA. On October 16, 1996, Appellant filed a notice of appeal. After several requests for extensions of time and a delay in obtaining the transcript of the permanent custody trial, we now reach Appellant's assignments of error. In her first assignment of error, she contends:
 "1. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY RULING THAT THE CHILDREN COULD NOT BE PLACED WITH THE MOTHER WITHIN A REASONABLE AMOUNT OF TIME AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
Appellant challenges the lower court's finding that the children could not be placed back with her within a reasonable period of time. She asserts that only two of the listed circumstances apply, namely R.C. 2151.414(E)(1) and (2), and argues that clear and convincing evidence was not presented as to either of these circumstances.
This Court has held that a trial court's judgment terminating parental rights will not be reversed if, upon a review of the record, we determine that the trial court had clear and convincing evidence before it. In the Matter ofHoneycutt(Mar. 6, 1998), Belmont App. No. 95-BA-48, citing Inre Wise(1994), 96 Ohio App.3d 619. Clear and convincing evidence involves more than a preponderance. It requires proof of each allegation clearly and convincingly so that a firm belief as to the facts is produced in the mind of the trier of fact. Honeycutt, supra; In re Brown(1994), 98 Ohio App.3d 337,342-343 quoting In re Adoption of Holcomb(1985), 18 Ohio St.3d 361,368 quoting Cross v. Ledford(1954), 161 Ohio St. 469, paragraph three of the syllabus. Generally, a reviewing court will not reverse a judgment on a "weight of the evidence" issue since the lower court as trier of fact is in the best position to weigh the evidence and evaluate the testimony. Brown,98 Ohio App. 3d at 342.
At the time of the filing of the motions for permanent custody, R.C. 2151.414(B)[1] provided in relevant part that:
 " * * * the court determine, * * * by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 "(1) the child is not abandoned or orphaned and the child cannot be placed with either of his parents within a reasonable time or should not be placed with his parents ;"
R.C. 2151.414(E) provided that a court must enter a finding that the children cannot or should not be placed with the parents within a reasonable time if clear and convincing evidence of any one of a list of enumerated circumstances exist.
In its judgment entry, the juvenile court relied upon former R.C. 2151.414(E)(1)[2] in finding that "* * * mother has failed continuously and repeatedly failed for a period of six (6) months or more to substantially remedy the conditions which caused the child/ren to initially be placed outside the home * * *" (9/19/96 J.E.). This section provided:
 "Following the placement of the child outside his home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly for a period of six months or more to substantially remedy the conditions causing the child to be placed outside his home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."
In its oral decision immediately following the trial, the lower court found that Appellant's lower intelligence level coupled with her lack of motivation were also reasons for granting permanent custody of the children to CSA. This was due to the special needs of the children, especially Ricky. (9/18/96 Permanent Custody Trial Tr. pp. 176-177).
We find that sufficient competent credible evidence existed to support the court's findings. A trial court may not grant permanent custody of a child to the county unless it finds, clearly and convincingly, that one or more of the statutorily enumerated factors exists. In re Dylan C.(1997), 121 Ohio App.3d 115,121, citing In re William S.(1996), 75 Ohio St.3d 95, 99.
The case plan objectives coincide with the conditions causing initial removal of the children. These objectives have been earlier outlined. They address the problems of appropriate parenting and care of the children, evaluation and counseling for domestic violence and alcohol problems, and additional counseling and other assistance for Appellant due to her lower level of functioning and the special needs of the children, especially Ricky.
The transcript demonstrates that the trial court had before it clear and convincing evidence that Appellant had not remedied the conditions causing initial removal of the children and that she failed to substantially comply with the case plan objectives. Many witnesses testified as to Appellant's failure to take responsibility for the removal of the children and her lack of cooperation and lack of motivation in remedying these conditions. (Tr. pp. 49, 70, 71, 74, 78, 83, 108, 117). Many also doubted Appellant's ability to care for the children, especially Ricky, due to her lower level of intellectual functioning coupled with her lack of motivation and refusal to accept agency assistance. (Tr. PP. 17, 40, 49, 70-71, 111).
Ruth McVay from Florence Crittendon Outreach Services testified that her agency had been providing services to Appellant since 1994 at appellant's initial request through CSA. (Tr. P. 70). Ms. McVay related that from initial contact up to and including the time of the filing of the motions for permanent custody, Appellant still refused to take responsibility for the neglect of the children and the overdose in Ricky's medication. (Tr. p. 70) Ms. McVay testified that she began providing instructions to Appellant including: teaching her how to meet the basic needs of her children, hygiene, money management, education, safety issues, domestic violence issues, housekeeping and transportation. (Tr. p. 60) A treatment plan was also established that set goals similar to those in Appellant's case plan with CSA.
Ms. McVay expressed uncertainty that Appellant could be rehabilitated due to her continuing inability to take responsibility and her lack of motivation. (Tr. p. 70). She also explained that Appellant had been receiving hands-on in-home training services from the agency and that she recently began refusing these types of services because she felt they were unnecessary. (Tr. pp. 67-68).
Ms. McVay also questioned whether Ricky was timely receiving his medication and explained that she devised a medication chart for Appellant to follow but later found that she did not use the chart. (Tr. p. 62). Ms. McVay was concerned with Appellant's choice of meals for the children and herself despite the fact that they had gone over nutritional basics and the importance to Appellant of eating before taking her medication. (Tr. P. 67). This goes to proof of Appellant's failure to comply with case plan objective number one and failure to remedy the conditions which caused Ricky's overmedication and general neglect of the children. This also demonstrates that Appellant has not substantially complied with objective number five to work cooperatively with Crittendon Outreach Services. (Tr. pp. 59-72).
Further, with regard to objective number one, to provide a home free of abuse and neglect for the children, CSA caseworker Jamie Coen Pickens testified that Appellant's new home was not yet up to CSA standards for approval as a stronger baby gate was needed to protect the children from the stairs, screens were missing from all of the windows in the house and the home contained only one bedroom with an additional bedroom still under construction. (Tr. pp. 103-104). Ms. Pickens acknowledged that Appellant had recently moved into the house and that in time the needed improvements might be made. (Tr. p. 116). However, Ms. Pickens testified as to her involvement in a previous residential situation with Appellant when Appellant was being evicted from her apartment and refused to look for a new residence even after constant urging by the caseworkers. (Tr. P. 109). Finally, on the very day that she was to be evicted, Ms. Pickens had to telephone Appellant's mother and ask her if Appellant could move in with her, as she would otherwise be homeless. (Tr. P. 109). This evidence combined to show noncompliance with objective number one.
Nancy Zinn from Community Mental Health Services testified that Appellant received a mental health evaluation and began attending marriage therapy for domestic violence issues both with Taylor present and individually. However, Ms. Zinn testified that Appellant and Taylor attended only a month of counseling and then stopped attending. (Tr. pp. 20, 23). Ms. Zinn testified that Appellant also began her individual therapy but then failed to appear, although she had not been released. (Tr. p. 16). Ms. Zinn also expressed her concerns over Appellant's denial of any problems with her children and denial of or inability to understand the reasons why she had to attend therapy. (Tr. p. 22). She testified that Appellant denied her own epileptic condition. (Tr. P. 19). Ms. Zinn opined that therapy was not benefiting Appellant. (Tr. p. 24). Thus, there was no substantial compliance with objective number two.
Objective number three, to complete a drug and alcohol assessment and to follow counseling recommendations, has been partially accomplished. Mr. James Muloolly of Crossroads Counseling Inc. performed an evaluation on Appellant and found that although she was not technically in need of counseling for a drug or alcohol problem, he was concerned that she consumed alcohol while on medication for her epileptic condition. (Tr. p. 25-26). Mr. Muloolly testified that although Appellant told him that her doctor in Columbus said that she could drink alcohol while on her medication, he felt that a mixture of alcohol and her sedative medication would interfere with the full function of the medication. (Tr. pp. 26-27). Ms. Zinn had earlier testified that Appellant told her that CSA made a visit to her home at eight o'clock in the morning and found her drinking a beer and found the house in "shambles." (Tr. P. 17). Thus, while she completed counseling, this demonstrates a failure to remedy the condition of drinking while on medication and could pose a danger to both Appellant and the children should her seizure medication not work.
Although appellant has procedurally completed objective number four, to attend parenting classes, class instructor Patrick Dittoe indicated that she did not quite achieve the testing score to show average improvement in her parenting skills. (Tr. p. 53). He recommended therapeutic counseling for Appellant, more consistent in-home services, and more concrete types of parenting education for her so that she could better grasp parenting concepts. (Tr. p. 53-56). Ruth McVay testified that Appellant had been receiving such training and services from her agency but that she recently refused these services. (Tr. pp. 67-68).
Judy Beckett of CSA found Appellant "defiant" and "not alot of help" with the children. (Tr. p. 83, 84). She recalled a visit where they were sitting on the front porch at Appellant's house chatting while Appellant allowed Jason to wander out to an alley near a busy street. (Tr. p. 80). One of the caseworkers had to go retrieve him. Ms. Beckett also recounted a visit where she, Appellant and Jason went out to the backyard and Appellant told her current husband to stay inside and watch Ricky, the child who has severe epileptic seizures and whom Appellant had left lying on a couch. (Tr. p. 85). The husband instead came outside with them and left Ricky on the couch unattended. (Tr. p. 85). He and Appellant left to visit a neighbor. Ms. Beckett was forced to check on Ricky. (Tr. p. 85). When asked about this situation at trial, Appellant testified that she would have gone inside had she known that her husband wanted to come outside. She then stated that she locked the door before they left so that Ricky could not unlock it. (Tr. p. 169). Appellant seemed to believe that locking the door would have protected Ricky. At trial, counsel had to bring to her attention the possibility that Ricky could have been hurt when left. (Tr. p. 169).
Additionally, those service providers who monitored visitations between Appellant and the children testified that they felt that their presence was detrimental to the visits. Caseworker Pickens stopped attending the entire visit because Appellant would spend all of her time talking to Ms. Pickens and not interacting with the children. (Tr. p. 107). Further, Appellant would expect that those visiting or supervising visits would care for the children and watch over them. Appellant would also direct her husband to chase after the children while she sat on a chair. (Tr. p. 108). The visitation workers would have to prompt Appellant to care for the children and interact with them. (Tr. pp. 68, 78, 84, 108-110). Ms. McVay recalled an instance when she stopped in to visit Appellant. She testified that Appellant sat in a chair and ordered Joey to go and buy her doughnuts and milk, get her purse, pour her a glass of milk, get her socks, put the socks on her feet, get the telephone for her, dial the number, and ask for the person to whom she wished to speak. At no time did Appellant leave the chair. (Tr. P. 71).
Concerns were also expressed over Appellant's current husband. The record shows that he was sexually molested by his father as a child, had a juvenile record and received treatment in a juvenile program for inappropriately touching women and had a brother who served time for raping their sister. (Tr. p. 92-96).
Appellant has not been able to comply with objective six, requiring her to attend all of Ricky's Easter Seal appointments to learn adequate therapy techniques for her child. Ms. Pickens testified that Appellant did attend some appointments but that therapists were unsuccessful in teaching Appellant the therapy techniques due to the complexity of the therapy and the severe special needs of Ricky. (Tr. p. 106).
Further, Ms. Stein from Buckeye Health explained Ricky's severe seizure disorder and testified that Ricky required a great deal of attentiveness because his reactions to the frequent medication adjustments needed to be constantly monitored and tracked to determine when and if further adjustments were needed. (Tr. p. 36-39). She opined that it would be extremely difficult for a person with an IQ of 73 to manage the medication and to monitor Ricky's physical reactions to it and report these observations to the doctor and nurses. (Tr. p. 39-40). She did state that if a person with a lower IQ had a support system of attentive and caring people to assist her, it could be done. (Tr. p. 41) Witnesses testified that Appellant lacked a successful support system. She experiences difficulties with her own mother (Tr. p. 109) and her mother-in-law has a disabled child for whom she cares. (Tr. p. 144). Further, her current husband admits that he is a "slow learner." (Tr. p. 99).
Based upon the record, competent, credible evidence existed whereby the court could have found clearly and convincingly that Appellant had repeatedly and continuously failed to remedy the conditions causing removal of her children under R.C.2151.414(E)(1). Competent, credible evidence existed to find that Appellant's lower functioning level coupled with her lack of motivation and the children's special needs rendered her unable to provide a permanent home under R.C. 2151.414(E)(2) and unwilling to prevent the children from suffering physical, emotional or mental neglect under R.C. 2151.414(E)(8). Based on the above, the first assignment of error is without merit.
In her second assignment of error, Appellant asserts:
 "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO MAKE AN INDEPENDENT DETERMINATION OF ALL RELEVANT STATUTORY AND ALL OTHER RELEVANT EVIDENCE FOR EACH MINOR CHILD INDEPENDENT OF THE OTHER IN THIS MULTICHILD PERMANENT CUSTODY PROCEEDING."
Appellant argues that the court erred in making only one finding for the permanent custody of both of the children. She cites In re Hiatt(1993), 86 Ohio App.3d 716, for the proposition that a trial court must make an independent ruling on each child. Appellant contends that the court's ruling that she was unable to care for Ricky due to his special needs should not be considered when determining her ability to care for Jason.
Appellant is correct that a court must make an independent determination with regard to permanent custody of more than one child in a multichild family. Hiatt, 86 Ohio App.3d at 725. However, while Hiatt held that the juvenile court must consider evidence and statutory criteria separately for each child in such a proceeding, it also asserted that:
 ". . ., this should not be construed to require courts to consider permanent custody decisions in a vacuum, i.e., how a parent mistreats another child in the household can be very relevant to the permanent custody determination of a child that is not mistreated in the same manner . . .
"* * *
 "Indeed, this appears to comport with R.C. 2151.04(D)(2), which defines "dependent children" to include those children who, because of the circumstances surrounding the abuse of a sibling in the same household, are also in danger of being abused or neglected by the parents in the same household." Id.
Further, the Hiatt court did not state that the independent determination had to be made in writing in the judgment entry granting permanent custody. The Hiatt court reviewed the record and found that the trial court considered the relevant criteria and evidence for each child individually. 86 Ohio App.3d at 726. The Hiatt panel also cited R.C. 2151.414(C) and noted that the parent failed to request specific findings of fact and conclusions of law. R.C. 2151.414(C) provides in relevant part:
 "If the court grants permanent custody of a child to a movant under this division, the court, upon the request of any party, shall file a written opinion setting forth its findings of fact and conclusions of law in relation to the proceeding." (emphasis added).
Absent a request by a party, a juvenile court's failure to make specific findings of fact and conclusions of law or statutory determinations within its judgment entry is not error. In re Covin (1982), 8 Ohio App.3d 139, 141 (citing a former version of the statute under R.C. 2151.414 (B) with identical language to R.C. 2151.414(C) as referenced above). Hiatt appears to support this holding as well.
Similar to that found in Hiatt, the record in the instant case does not show that Appellant made a request pursuant to R.C.2151.414(C). The transcript of the permanent custody trial does indicate that the court considered each child separately. (Tr. p. 176). Appellant's second assignment of error is therefore without merit.
Appellant's final assignment of error states:
 "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY GRANTING PERMANENT CUSTODY TO THE BELMONT COUNTY DEPARTMENT OF HUMAN SERVICES AGENCY IN THE ABSENCE OF EVIDENCE THAT THE BOARD MADE A REASONABLE EFFORT OF REUNIFICATION DURING THE PERIOD OF TEMPORARY CUSTODY."
Appellant asserts that CSA did not make reasonable efforts to reunify her with her children as required under R.C. 2151.419. She maintains that due to her lower level of intellectual functioning, CSA should have provided more assistance to her and asserts that the six month period between temporary custody and filing for permanent custody was not enough to provide a reasonable attempt at reunification.
R.C. 2151.419 in effect at the time[3] provided that:
 "(A) At any hearing * * * at which the court removes a child from his home or continues the removal of a child from his home, the court shall determine whether the public children services agency * * * has made reasonable efforts to prevent the removal of the child from his home, to eliminate the continued removal of the child from his home, or to make it possible for the child to return home. The agency shall have the burden of proving that it has made those reasonable efforts."
R.C. 2151.414(E)(1) also states that the agency must undertake "* * * reasonable case planning and diligent efforts * * * to assist the parents to remedy the problems that initially caused the child to be placed outside the home * * *."
The juvenile court's September 19, 1996 journal entry in the instant case stated that reasonable and diligent efforts had been made by the agency. This Court has stated that the issue is not whether the Children Services Board could have done more, but whether it did enough to satisfy the reasonableness standard under the statute. In the Matter of Tirado(Jan. 22, 1998), Mahoning App. No. 97 CA 26, unreported, citing In re William S. (1996), 75 Ohio St.3d 95, 99; In the Matter of Brewer Feb. 12, 1996), Belmont App. No. 94-B 28, unreported.
While we are cognizant that a six month period between temporary and permanent custody is a very short period of time and that the agency could have allowed more time, the juvenile statutes support a six month period as a guide in permanent custody situations. The former version of R.C. 2151.414(E)(1) set forth in assignment number one mandated that a court find that the children should not or could not be returned to the parents if the parents continuously and repeatedly failed to substantially remedy the conditions causing removal for a period of at least six months. And former R.C. 2151.413(A)[4] required that a children's services agency wait at least six months prior to filing to convert temporary custody into permanent custody. 142 Ohio Laws, Part I, 237. Although these statutes have been amended and the six month period deleted, no time periods have been substituted.
Additionally, the record in this case shows that CSA provided numerous services to Appellant over an extended period of time. A CSA caseworker established a case plan for Appellant with objectives establishing areas that needed improvement before her children would be returned. (Tr. p. 103). The case plan was explained to Appellant in terms that she could understand and she was given a copy of the case plan at least fourteen times by the same caseworker. (Tr. p. 115). The caseworkers arranged and monitored visitations between Appellant and the children and provided transportation when requested. Caseworkers referred her to other agencies for assistance, including Community Mental Health Services (Tr. p. 10), Crossroads Counseling Incorporated (Tr. p. 25), School of Hope (Tr. p. 49), CSA-parent educator services (Tr. p. 52), and Florence Crittendon Outreach Services (Tr. p. 60). There is nothing in the record to suggest that CSA did less than that required and the record bears out that more than diligent efforts were made by CSA to help Appellant in her situation. Most of the providers noted Appellant's lack of cooperation and motivation. (Tr. p. 49, 71, 74, 78, 83, 108, 117). CSA also provided her services for the children's needs.
Further, although voluntary requests for assistance do not lead to an official opening of a case with CSA, we must note that some of the agencies were assisting Appellant for much longer than six months and had been providing in-home and hands-on services as later recommended by the parent educator. (Tr. p. 56, 60, 67). Testimony established that some services began as early as 1994.
In consideration of R.C. 2151.41(C) and testimony demonstrating the numerous efforts undertaken by CSA, we find that the court was presented with clear and convincing evidence that CSA undertook reasonable efforts to assist Appellant.
For the foregoing reasons, we find that the assignments of error advanced by Appellant are without merit. Accordingly, the trial court judgment is affirmed.
DONOFRIO, J., concurs.
VUKOVICH, J., concurs.
APPROVED:
 _______________________________ CHERYL L. WAITE JUDGE
[1] This section was amended by 1996 H 419, effective September 18, 1996 and amended by 1998 H 484, effective March 18, 1999.
[2] This section has also been amended by 1996 H 419, effective, September 18, 1996 and again by 1998 H 484, effective March 18, 1999.
[3] This statute has also since been amended under 1998 H 484, effective March 18, 1999.
[4] This section was amended under 1996 H 419, effective September 18, 1996 and gain amended under 1998 H 484, effective March 18, 1999.